**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **NOEMÍ NIEVES FLORÁN,** | |
| Plaintiff, | |
| v. | Civil No. 16-1930 (BJM) |
| **DOCTORS' CENTER HOSPITAL, INC.**, *et al.*, | |
| Defendants. | |

## OPINION AND ORDER

Plaintiff Noemí Nieves Florán ("Nieves") brought this action against Doctors' Center Hospital ("Doctors"), Dr. Maritza Loinaz-Rivera ("Dr. Loinaz"), and their insurers, alleging violations of the Emergency Medical Treatment and Labor Act ("EMTALA" or "the Act"), 42 U.S.C. §§ 1395dd, and medical malpractice under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141. Dkt. 126 ("Am. Compl."). Doctors moved to dismiss Nieves's EMTALA claims. Dkt. 191. Nieves has not opposed. This matter is before me by consent of the parties. Dkt. 165.

For the reasons set forth below, the motion to dismiss is **GRANTED**.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss for lack of subject matter jurisdiction. Courts are generally obligated to address questions of subject matter jurisdiction before the merits of a case. *Sinapi v. Rhode Island Bd. of Bar Examiners*, 910 F.3d 544, 549 (1st Cir. 2018) (citing *Acosta-Ramírez v. Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013)). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007) (citing *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995)).

When faced with a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court "accept[s] as true all well-pleaded facts alleged in the complaint and draws all

reasonable inferences therefrom in the pleader's favor" to determine whether the complaint states a claim for which relief can be granted. *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011). These facts and inferences may be augmented "with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011).

Dismissal under Rule 12(b)(6) is inappropriate if the complaint provides "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ocasio-Hernandez v. Fornuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting Fed. R. Civ. P. 8(a)(2)). "A short and plain statement needs only enough detail to provide a defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 12 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This requires that the complaint contain sufficient facts "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.*

In making this determination, courts employ a two-pronged approach, first by identifying and disregarding statements in the complaint that offer "legal conclusion[s] couched as . . . fact" or "[t]hreadbare recitals of the elements of action." *Twombly*, 550 U.S. at 555. All non-conclusory factual allegations are treated as true, "even if seemingly incredible." *Ocasio-Hernandez*, 640 F.3d at 12 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680–681 (2009)). If the complaint's properly pleaded factual content, read as a whole, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, the claim has facial plausibility." *Iqbal*, 556 U.S. at 677. Applying the plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 662.

## BACKGROUND

On May 11, 2015, Nieves fell while she was visiting her sister, sustaining a severe fracture and dislocation to her right ankle. Am. Compl. ¶¶ 1, 3. An ambulance arrived, and

first responders used wooden splints to stabilize Nieves's ankle. *Id.* ¶ 2. They brought her to Doctors' emergency room at 10:26 pm. *Id.* ¶ 3.

At the hospital, blood work and x-rays were performed, demonstrating that Nieves had suffered multiple fractures and ankle dislocation. *Id.* ¶ 4. An emergency room doctor told Nieves to wait for an orthopedic doctor, and Nieves waited in an emergency room bed in a hallway. *Id.* ¶ 5.

At 8:30 am the next morning, hospitalist Dr. Harley Arraut-Ramirez (Dr. Arraut) officially admitted Nieves to the hospital and into the care of Dr. Norbert Correa-Sandina (Dr. Correa). *Id.* ¶¶ 6–7. At the time of her admission, Nieves was still in the emergency room. *Id.* ¶¶ 6–7, 10. According to a progress note written by Dr. Correa, Nieves was admitted "for evaluation from medical point of view for treatment of bimalleolarfreacture [sic]" and that there was no "contraindication at the moment for surgery." *Id.* ¶ 9.

At 4:00 pm on May 12, Dr. Loinaz performed an orthopedic consultation. *Id.* ¶ 8. She diagnosed Nieves with a right ankle bimalleolar fracture and described a treatment plan as "will admit for proper treatment." *Id.* At 8:00 am on May 13, Dr. Correa filled out a progress note indicating that Nieves had been admitted to his service. *Id.* ¶ 9. On May 14, Nieves was informed that Doctors had a room available for her. *Id.* ¶ 10.

On May 15, Nieves's family arrived from New York and demanded to know why an orthopedic surgeon had not yet seen Nieves even though she had been in the hospital for three days. *Id.* ¶ 11. An orthopedic surgeon came to see Nieves and advised that she needed ankle surgery as soon as possible. *Id.* ¶ 12. She also explained that Nieves's insurance would not pay for the surgery if it were performed at Doctors. *Id.* That same day, Dr. Loinaz wrote a note explaining that she had been notified when Nieves arrived to the emergency room, but she had asked that Nieves be transferred to a public hospital because she had no insurance. *Id.* ¶ 13. The note also explained that Nieves's admission by Dr. Arraut was against the advice of Dr. Loinaz. *Id.*

Nieves was discharged from the hospital on May 15. *Id.* ¶ 14. In a discharge summary, Dr. Loinaz indicated that Nieves's ankle had been re-splinted before Nieves would be leaving to New York. *Id.* That summary does not indicate that Nieves's ankle was reduced or set. *Id.*

On May 16, Nieves flew to New York, where she was admitted to another hospital and where x-rays revealed "marked posterolateral dislocation" and fractures. *Id.* ¶ 15. Nieves's fracture dislocation was reduced, and new x-rays demonstrated that the posterior dislocation was resolved. *Id.* ¶ 16. Nieves underwent surgery on May 29. *Id.* ¶ 17. Nine months after the surgery, Nieves was using a walker and suffering from pain and limited mobility, which, according to her expert witness, is a poor outcome. *Id.* ¶ 18.

Nieves brought suit against Doctors and other defendants alleging, inter alia, that Doctors violated EMTALA's screening and stabilization requirements. *Id.* ¶¶ 40–46.

## DISCUSSION

At the outset, I note that Doctors fashions its motion as both a Rule 12(b)(6) motion to dismiss for failure to state a claim and a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. Doctors' arguments, however, "appear to confound jurisdictional with merits-based issues." *Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 717 F.3d 63, 67 (1st Cir. 2013). Despite purporting to question the court's subject matter jurisdiction, Doctors does not address whether Nieves's EMTALA claims, brought under a federal statute, arise under the laws of the United States as required for jurisdiction under 28 U.S.C. § 1331. Rather, Doctors focuses its arguments on the sufficiency of Nieves's allegations. But "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citations omitted); *see also Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974) (explaining that dismissal for lack of subject matter jurisdiction based on the inadequacy of the federal claim is proper only when the claim is "so insubstantial,

implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy"); *Baker v. Carr*, 369 U.S. 186, 200 (1962) (citations omitted) ("[T]he failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction."). Finding that this court has federal question jurisdiction over Nieves's EMTALA claims, I will proceed to consider Doctors' motion as a Rule 12(b)(6) motion to dismiss for failure to plead facts sufficient to sustain an EMTALA claim.

In light of Nieves's failure to oppose Doctors' motion to dismiss, Doctors asked that I grant its motion as unopposed and deem all objections waived pursuant to Local Rule 7(b). Dkt. 195; *see* Local Rules of the U.S. Dist. Court for the Dist. of P.R. Rule 7(b) ("Unless within fourteen (14) days after the service of a motion the opposing party files a written objection to the motion, incorporating a memorandum of law, the opposing party shall be deemed to have waived objection."). "When deciding a 12(b)(6) motion, 'the mere fact that a motion to dismiss is unopposed does not relieve the district court of the obligation to examine the complaint itself to see whether it is formally sufficient to state a claim.'" *Pomerleau v. W. Springfield Pub. Sch.*, 362 F.3d 143, 145 (1st Cir. 2004) (citing *Vega–Encarnacion v. Babilonia*, 344 F.3d 37, 41 (1st Cir. 2003). Indeed, "a court may not automatically treat a failure to respond to a 12(b)(6) motion as a procedural default." *Id.* (citing *Pinto v. Universidad De Puerto Rico*, 895 F.2d 18, 19 & n. 1 (1st Cir. 1990)). Accordingly, I will decide Doctors' motion to dismiss based on the sufficiency of the complaint itself despite Nieves's failure to oppose.

## I.        EMTALA

EMTALA was enacted "in 1996 in response to claims that hospital emergency rooms were refusing to treat patients with emergency conditions but no medical insurance." *Ramos-Cruz v. Centro Medico del Turabo*, 642 F.3d 17, 18 (1st Cir. 2011). "EMTALA therefore 'is a limited anti-dumping statute, not a federal malpractice statute.'" *Id.* (quoting

*Reynolds v. Me. Gen. Health*, 218 F.3d 78, 83 (1st Cir. 2000)). The Act "creates private rights of action where hospitals violate [EMTALA's] mandates." *Id.*

A plaintiff seeking to establish an EMTALA violation "must show (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department; (2) the plaintiff arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) released the patient without first stabilizing the emergency medical condition." *Cruz-Vazquez*, 717 F.3d at 68 (citing *Correa v. Hosp. S.F.*, 69 F.3d 1184, 1189 (1st Cir. 1995)); *see also Lopez-Soto v. Hawayek*, 175 F.3d 170, 177 (1st Cir. 1999) ("subsections (a) and (b) of EMTALA operate disjunctively").

Nieves's amended complaint alleges both screening and stabilization violations. Am. Compl. ¶¶ 40–46. Doctors does not challenge Nieves's ability to show that it was covered by EMTALA, that it operates an emergency department, or that Nieves arrived to the hospital seeking medical treatment. *See Cruz-Vazquez*, 717 F.3d at 68. Instead, Doctors contends that (1) Nieves's screening claim must be dismissed because she has not alleged the absence of screening or disparate screening, and (2) her stabilization claim must be dismissed because she was admitted to the hospital, rendering the stabilization provision of EMTALA inapplicable. Doctors also argues that dismissal is required because Nieves lacks an expert to opine on Doctors' approach to screening and stabilizing Nieves.

## A.      Screening Claim

The Act does not define an "appropriate medical screening examination." *Cruz-Queipo v. Hosp. Español Auxilio Mutuo de P.R.*, 417 F.3d 67, 70 (1st Cir. 2005). But under First Circuit law, a "hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Id.* (quoting *Correa*, 69 F.3d at 1192). *Faulty* screening, as opposed to disparate screening or no

screening at all, does not contravene the Act. *Correa*, 69 F.3d at 1192–93. Rather, the essence of EMTALA's screening requirement "is that there be some screening procedure, and that it be administered even-handedly." *Correa*, 69 F.3d at 1192; *see also Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 878 & 879 n. 7 (4th Cir. 1992) ("EMTALA only requires hospitals to apply their standard screening procedure for identification of an emergency medical condition uniformly to all patients.").

Here, Nieves has alleged that she arrived to Doctors' emergency room by ambulance after she fell and hurt her right ankle. Am. Compl. ¶¶ 1–3. In the emergency room, someone performed blood work and took x-rays, which revealed multiple fractures and dislocation, and an emergency room doctor told Nieves to wait for an orthopedic doctor. *Id.* ¶¶ 4–5. She was admitted to the hospital roughly ten hours after arriving to the emergency room, received an orthopedic consult roughly eight hours after her admission, and, after a three-day wait, was informed that she needed surgery on her ankle as soon as possible. *Id.* ¶¶ 6, 8, 12. Nieves alleges that, although Doctors has no screening manual, it provides screening "based by medical knowledge according to condition." *Id.* ¶ 43. According to her complaint, Doctors' usual practice is "to provide appropriate medical screening," and Doctors failed to follow this practice because its "screening was so deficient that it deviated from the National Standard of Screening in such a way that it amounted to no screening at all." *Id.* ¶ 44.

These allegations, even when viewed in the light most favorable to Nieves, do not amount to a violation of EMTALA's screening requirements. First, Nieves has not properly alleged that Doctors failed entirely to screen her. Rather, someone took x-rays and performed blood work, an emergency room doctor determined that Nieves needed to see an orthopedic physician, and an orthopedic physician ultimately saw Nieves and diagnosed her with right ankle bimalleolar fracture. These facts demonstrate that some screening occurred. Second, the fact that Nieves alleges she was admitted to the hospital indicates that Doctors met its EMTALA screening duties. *See Reynolds*, 218 F.3d at 83 ("The fact

that Mr. Reynolds was in the hospital receiving treatment is a prima facie showing that the purpose of subsection (a) was satisfied; any failures of diagnosis or treatment were then remediable under state medical malpractice law."); *Alvarez-Torres v. Ryder Mem'l Hosp., Inc.*, 576 F. Supp. 2d 278, 284 (D.P.R. 2008) ("[T]here is a prima facie showing that Ryder satisfied the screening provision of EMTALA because Martinez Lopez was admitted to the hospital after visiting the ER.").

Finally, the thrust of Nieves's argument is that Doctors has a policy of providing "appropriate screening," but the screening Doctors provided her was inappropriate. This amounts to an attempt "to bring a malpractice standard into the interpretation and application of a statute designed to complement and not incorporate state malpractice law." *Reynolds*, 218 F.3d at 84. A deviation from national screening standards is not an EMTALA screening violation unless a hospital expressly adopted those standards but failed to follow them in a particular case. *See del Carmen Guadalupe v. Negron Agosto*, 299 F.3d 15, 21 (1st Cir. 2002) (quoting *Baber*, 977 F.2d at 879–80) ("Had Congress intended to require hospitals to provide a screening examination which comported with generally accepted medical standards, it could have clearly specified a national standard."). But Nieves has not alleged that Doctors' adopted "the National Standard of Screening." Am. Compl. ¶ 44.

Nieves has not alleged that she "received materially different screening than that provided to others in [her] condition." *Id.* She did not allege, for instance, that Doctors' regular screening procedures for patients with ankle fractures involves bringing such patients to orthopedic physicians within a certain amount of time, and Doctors failed to follow that procedure in her case. Rather, she alleges generally faulty screening, which, although perhaps sounding in tort, does not state an EMTALA violation. *See Correa*, 69 F.3d at 1192–93.

For these reasons, Nieves's EMTALA screening claim is dismissed with prejudice.

**B.    Stabilization Claim**

"EMTALA requires covered hospitals to 'stabilize' an individual if 'the hospital determines that the individual has an emergency medical condition.'" *Alvarez-Torres*, 576 F. Supp. at 284 (quoting 42 U.S.C. § 1395dd(b)(1)); *see also Reynolds*, 218 F.3d at 85 (quoting *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1140 (8th Cir. 1996)) (explaining that there is no duty to stabilize unless hospital "has actual knowledge of the individual's unstabilized emergency medical condition"). An emergency medical condition is one that manifests itself by such severe symptoms "that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(E)(1)(A). Stabilization requires the provision of "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer [including the discharge] of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(A); *see also* 42 U.S.C. § 1395dd(e)(4) (defining "transfer.").

Nieves alleges that she came to Doctors suffering from a fractured and dislocated ankle. Am. Compl. ¶¶ 1, 3. According to Nieves, that fracture was an emergency medical condition because, without immediate medical attention, she could reasonably be expected to develop a serious disability. *Id.* ¶ 47. After x-rays and bloodwork, Dr. Arraut admitted Nieves into the care of Dr. Correa, who noted that her admission was "for evaluation from medical point of view for treatment of bimalleolarfracture [sic]." *Id.* ¶¶ 5–7, 9. Nieves's admission was against the advice of Dr. Loinaz, who had performed an orthopedic consult and requested that Nieves be transferred to a public hospital because she had no insurance. *Id.* ¶¶ 8, 13. After two days in the emergency room, Doctors informed Nieves they had a room for her. *Id.* ¶ 10. After three days in the hospital, Nieves's family arrived and demanded to know why Nieves had not been seen by an orthopedic surgeon. *Id.* ¶ 11. An orthopedic surgeon came to see Nieves and advised that she needed ankle surgery as soon

as possible but that Nieves's insurance would not pay for it. *Id.* ¶¶ 11–12. Nieves's ankle was re-splinted, but not reduced or set, and Nieves was discharged. *Id.* ¶ 14.

Even if I assume that Nieves's broken ankle was an emergency medical condition, Nieves has not alleged sufficient facts to raise her right to relief under EMTALA's stabilization provision above the speculative level. "[I]n determining whether a patient has been stabilized, the fact-finder must consider whether the medical treatment and subsequent release were reasonable in view of the circumstances that existed at the time the hospital discharged or transferred the individual." *Torres Otero v. Hosp. Gen. Menonita*, 115 F. Supp. 2d 253, 259–60 (D.P.R. 2000) (citing *Delaney v. Cade*, 986 F.2d 387, 393 (10th Cir. 1993)). Doctors x-rayed Nieves's ankle, performed blood work, admitted her for treatment, and re-splinted the ankle prior to discharge. Rather than alleging facts indicating that re-splinting the ankle was not reasonably calculated to prevent material deterioration of the condition during transfer, *see* 42 U.S.C. § 1395dd(e)(3)(A), Nieves merely recites the elements of an EMTALA stabilization violation. *See* Am. Compl. ¶ 46. And although Nieves urges that her treatment was delayed or incorrectly provided, such allegations do not state an EMTALA stabilization violation. *Torres Otero*, 115 F. Supp. 2d at 260 (finding that allegations that treatment was "incorrect and/or delayed" constituted an attempt "to engraft an EMTALA failure to stabilize claim upon a medical malpractice claim").

Moreover, Nieves herself alleges that she was admitted to the hospital for evaluation and treatment of her fracture. Various courts have determined that "EMTALA's stabilization requirement is not applicable in situations where an individual is admitted to the hospital for further treatment." *Benitez-Rodriguez v. Hosp. Pavia Hato Rey, Inc.*, 588 F. Supp. 2d 210, 214 (D.P.R. 2008) (citing cases); *see Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1167 (9th Cir. 2002) ("[T]he stabilization requirement normally ends when a patient is admitted for inpatient care."); *Harry v. Marchant*, 291 F.3d 767, 768–69 (11th Cir. 2002) (finding EMTALA's stabilization requirement inapplicable where patient was admitted as inpatient and never transferred to another hospital); *Thornhill v. Jackson Par.*

*Hosp.*, 184 F. Supp. 3d 392, 399 (W.D. La. 2016) (collecting cases); *Ceballos-Germosen v. Doctor's Hosp. Ctr. Manati*, 62 F. Supp. 3d 224, 232 (D.P.R. 2014) ("By admitting Germosén as an inpatient, the hospital had no duty to stabilize under EMTALA."); *Loaisiga-Cruz v. Hosp. San Juan Bautista*, 681 F. Supp. 2d 130, 135–36 (D.P.R. 2010) (finding that plaintiff had not stated a stabilization claim where plaintiff spent a period of time in the emergency room, was assigned a room in the hospital, and "where, at the very least, he received intravenous fluids and nurses attempted to insert a catheter"); *Vazquez-Rivera v. Hosp. Episcopal San Lucas, Inc.*, 620 F. Supp. 2d 264, 270 (D.P.R. 2009) ("[A] hospital fulfills its statutory duties under EMTALA once it admits the patient."); *Rivera v. Hosp. Episcopal Cristo Redentor*, 613 F. Supp. 2d 192, 200 (D.P.R. 2009); *Walley v. York Hosp.*, No. 2:18-CV-126-DBH, 2018 WL 3614967, at *2–3 (D. Me. July 27, 2018).

Indeed, the Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS"), the agency charged with administering EMTALA, has promulgated the following regulation:

> If a hospital has screened an individual . . . and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section [concerning the obligation to stabilize] with respect to that individual.

42 C.F.R. § 489.24(d)(2)(i). The regulation also states: "If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section." *Id.* § 489.24(a)(1)(ii) (emphasis added). The "vast majority" of courts to construe this regulation either gave it "controlling weight" or favorably cite it in "finding that a hospital's duty under EMTALA ends upon admitting a patient in good faith." *Thornhill*, 184 F. Supp. at 399 (citing cases).

Of course, not every admission to the hospital will satisfy EMTALA.[1] *See, e.g.*, *Moses v. Providence Hosp. and Med. Cent., Inc.*, 561 F.3d 573, 583 (6th Cir. 2009) (finding that the EMTALA duty to stabilize can extend to inpatient care); *Lima-Rivera v. UHS of Puerto Rico, Inc.*, 476 F. Supp. 2d 92, 99 (D.P.R. 2007) (finding that plaintiff had sufficiently pleaded an EMTALA violation where a baby was born in a hospital, admitted to intensive care, and transferred to an outside hospital while unstable). As CMS explains, only an admission made in good faith in order to stabilize the emergency medical condition will do. 42 C.F.R. § 489.24(d)(2)(i); *see also Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1135 (6th Cir. 1990) ("Hospitals may not circumvent the requirements of the Act merely by admitting an emergency room patient to the hospital, then immediately discharging that patient. Emergency care must be given until the patient's emergency medical condition is stabilized."); *Mazurkiewicz v. Doylestown Hosp.*, 305 F. Supp. 2d 437, 447 (E.D. Pa. 2004) ("[T]he most persuasive synthesis of the law on admission as a defense to EMTALA liability is that admission is a defense so long as admission is not a subterfuge.").

Here, however, Nieves has not alleged that her admission was a sham intended to subvert EMTALA or intended for any reason other than to treat her ankle. Although Nieves alleges that Dr. Loinaz advised against her admission based on her lack of insurance, Am. Compl. ¶¶ 8, 13, Nieves was nonetheless admitted for treatment, and her ankle was re-splinted. *Id.* ¶¶ 6, 9, 14. As with her screening claim, Nieves's stabilization claim essentially alleges malpractice, charging that Doctors' delay in treating her and the decision to re-splint

---

[1] Here, I take note of *Lopez–Soto v. Hawayek*, 175 F.3d 170 (1st Cir. 1999). In that case, the First Circuit explained that EMTALA imposes a duty on hospitals not only to stabilize patients who seek emergency treatment but also to any patient already admitted to the hospital who then develops an emergency condition. *Id.* at 175. I find *Lopez–Soto* inapplicable here both because at the time that case was decided the First Circuit did not have the benefit of CMS's inpatient regulation and because *Lopez–Soto* "did not specifically address a situation where a patient was admitted to the defendant hospital after entering the emergency room." *Benitez-Rodriguez*, 588 F. Supp. at 214.

as opposed to re-set fell below the professional standard of care. But "EMTALA does not create a cause of action for medical malpractice." *Correa*, 69 F.3d at 1192.

Given that (1) Doctors admitted Nieves to treat her ankle, (2) Doctors re-splinted her ankle, and (3) Nieves has not alleged facts indicating that re-splinting her ankle was not reasonably calculated to prevent material deterioration of her ankle during transfer, she has failed to state an EMTALA stabilization claim. Accordingly, that claim is dismissed with prejudice.[2]

## II.      Diversity Jurisdiction

Having dismissed Nieves's EMTALA claims, this court no longer has jurisdiction over this case pursuant to 28 U.S.C. § 1331. Nonetheless, this court retains subject matter jurisdiction over Nieves's remaining malpractice claims pursuant to 28 U.S.C. § 1331(a). Nieves is a citizen of New York, defendants are citizens of Puerto Rico and Illinois, and the alleged amount-in-controversy exceeds $75,000. *See* Am. Compl. ¶¶ A–E, Dkt. 126 at 13.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is **GRANTED.** The EMTALA claims, 42 U.S.C. § 1395dd, are **DISMISSED WITH PREJUDICE**. The state-law medical malpractice claims remain. P.R. Laws Ann. tit. 31, § 5141.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 12th day of February 2020.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge

---

[2] Because I dismiss Nieves's EMTALA claims, I do not at this time reach Doctors' argument regarding the opinions of Nieves's expert witness. Doing so requires looking to an expert report. "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). Although there are exceptions that permit a federal court to consider matters outside the pleadings, *id.* at 33–34, I see no need to decide whether the expert report falls into one of those exceptions, having dismissed on other grounds.